JOHN ROTHSCHILD & CO. ET AL. *v.* UNITED STATES (No. 3094) [1]

---

[1] T. D. 43190.

United States Court of Customs Appeals, January 9, 1929

*Frank L. Lawrence* (*Martin T. Baldwin* of counsel) for appellants.
*Charles D. Lawrence,* Assistant Attorney General (*John F. Kavanagh* and *Fred J. Carter,* special attorneys, of counsel), for the United States.

[Oral argument October 3, 1928, by Mr. Carter]

Before GRAHAM, Presiding Judge, and BLAND and HATFIELD, Associate Judges

BLAND, Judge, delivered the opinion of the court:

Certain rice, imported from Hong Kong, China, was entered for warehousing without the payment of duty at San Francisco, and, during the same year, was withdrawn for shipment to the island of Guam. The collector of customs at San Francisco liquidated the withdrawal entry and assessed duty upon the rice at 2 cents per pound under paragraph 727 of the Tariff Act of 1922. The importers, appellants, protested the action of the collector, and claimed that under section 557 of said act they were entitled to export said rice without any payment of duties to the United States. The United States Customs Court overruled the protest and the importers appealed to this court.

The pertinent portions of section 557, *supra,* read as follows:

SEC. 557. * * * Any merchandise subject to duty, * * * may be entered for warehousing and be deposited in a bonded warehouse at the expense and risk of the owner, importer, or consignee. Such merchandise * * * may be withdrawn for exportation or for transportation and exportation without the payment of duties thereon * * *.

Protestants contend that *exportation* in section 557 is not confined to shipments to foreign countries in the sense that such countries must be those over which the United States has no control. They point out that section 1 of Title I of the Tariff Act of 1922 excepts the Philippine Islands, the Virgin Islands, and the islands of Guam and Tutuila from the duty-levying provisions of the act, and that

the term "United States" is defined in section 401 of the Tariff Act of 1922 as follows:

SEC. 401. (j) The term "United States" includes all Territories and possessions of the United States, except the Philippine Islands, the Virgin Islands, and the islands of Guam and Tutuila.

Appellants argue therefrom that if Guam is not a part of the United States for tariff purposes, it is *foreign* for the purposes of exportation. Several authorities are cited which they contend support their position that "exportation" does not always mean the transportation of goods from one country to a foreign country, and frankly admit that Guam is not a foreign country in the ordinary sense. They argue that Guam doubtlessly has authority to establish its own customs duties and that the imposition of duties upon the rice by the collector at San Francisco might result in the payment of double duties, which could not have been within the contemplation of Congress in the enactment of section 557.

The Government relies chiefly on an opinion of the Attorney General of November 6, 1913, published in T. D. 33898, 25 Treas. Dec. 491. This and other authorities are cited to the effect that the words "exportation" and "importation" refer primarily to foreign countries. The Government also relies upon long-established administrative practice.

There is no testimony in the record of this case. Certain customs regulations as to the imposition of customs duties in Guam are cited by the Government, but it is not shown anywhere in this record what the dutiable status of rice is in the island of Guam, and we do not know that it is important.

Much of interest might be said in an attempt to determine the exact status of Guam as a possession or dependency of the United States. As we see it, the decision of the issue involved herein does not require such a determination. It seems to us that we must, from the context of various legislative acts and from the history of our relations with the island of Guam, determine what Congress meant by the use of the word "exportation" in section 557, and whether it was within the legislative contemplation that goods withdrawn from bonded warehouse and shipped to Guam were "exported" so as to entitle the goods to have a free status here.

Webster's New International Dictionary (1925) defines "export," "exportation," and "import" as follows:

Export. To carry or send abroad, esp. to foreign countries, as merchandise or commodities in the way of commerce;—the opposite of *import*.

Exportation. Act of exporting; act of conveying or sending commodities abroad, as in commerce.

Import. To bring in from a different source; to introduce from without; esp., to bring (wares or merchandise) into a place or a country from a foreign country in the transactions of commerce;—opposed to *export*.

But it must be conceded that the words "export" and "import" have been used by Congress in Tariff Acts in a somewhat different sense. In *May Co.* v. *United States*, 12 Ct. Cust. Appls. 266, this court held that the word "import" as used in paragraph Q of Section IV of the Tariff Act of 1913 applied to goods which were brought into this country and which had passed beyond the control of customs authorities with the intention that they should go into the commerce of the country. In *Cunard S. S. Co.* v. *Mellon*, 262 U. S. 100, the definition of the word "importation" as applied to the national prohibition act was discussed and it was held that the word "importation" meant "bringing an article into a country from the outside," regardless of the manner in which it was effected, and that it did not have to pass through a customhouse in order to be imported. Of course, in most instances in tariff acts, the word "importation" is used in a different sense than the sense in which it is used in the prohibition act.

The cases of *Woodruff* v. *Parham*, 8 Wall. 123, and *Faber* v. *United States*, 221 U. S. 649, were relied upon by the Government and the court below as supporting the position that Guam was not a foreign country and that, therefore, the shipment in this instance was not an exportation. Without quoting from or discussing the last two above-cited cases, we think they do support the position of the Government. They are not similar in all respects, but we regard the principles involved as substantially the same as in the case at bar. See also *Dooley* v. *United States*, 183 U. S. 151, and *The Eliza*, 8 Fed. Cas. 455.

The Government has cited and urged the controlling influence of T. D. 33898, *supra*, which Treasury decision is the action of the Secretary of the Treasury upon an opinion of the Attorney General (November 6, 1913) concerning the payment of drawback on articles shipped from this country to Guam. We think the language used is so apt that a somewhat extended quotation is proper here:

It is conclusively determined that *Guam* and *Tutuila* are not "foreign countries" within the meaning of our tariff acts. *Faber* v. *United States*, 221 U. S. 649, 658, and cases there cited (23 Op. A. G. 829). It is equally well settled that the terms "export" and "import" refer primarily to foreign countries. *Woodruff* v. *Parham*, 8 Wall. 123, 136; *Faber* v. *United States*, *supra*, p. 659; 23 Op. A. G. 418; 28 ib. 422.

It follows necessarily that the provision of section 25 of the Act of August 5, 1909, which allows drawback *"on the exportation"* of articles manufactured or produced in the United States from imported materials can not apply to articles shipped to Guam or Tutuila. The whole theory of the drawback provisions of the customs laws and of the Treasury regulations made in pursuance thereof is that the goods are to be "exported" to "foreign countries," to countries "out of the jurisdiction of the United States." The decision in *Swan & Finch Co.* v. *United States*, 37 Ct. Cls. 101, S C. 190 U. S. 143, is decisive as to the meaning of "exportation" in connection with drawbacks, and the term "exportation" has the same meaning in the laws relating to bonded warehouses (23 Op. A. G. 418).

It may be claimed with some persuasiveness that since Guam and Tutuila are, under section 1 of the Payne-Aldrich Act, permitted, like the Philippines, to make their own tariff on articles imported into those islands from foreign countries, and since, by various provisions of law, the drawback and bonded-warehouse privileges are granted to shippers from this country to the Philippines, therefore the Payne-Aldrich Act should be liberally construed so as to extend the same privileges to shippers to Guam and Tutuila. It is sufficient, however, to say that to insert into a tariff act and make applicable to two territories in the peculiar relation to this country of Guam and Tutuila, a body of provisions on a subject like drawbacks and bonded warehouses would be legislation, not construction, and especially so when it could only be done by giving an interpretation to the terms "foreign countries" and "exportation" entirely contrary to that repeatedly sanctioned by the Treasury Department and by the Supreme Court, and might bring about unforeseen evil results in the general administration of the customs laws.

See article 243 of the Customs Regulations of 1923 and T. D. 23367, 4 Treas. Dec. 902, November 20, 1901.

Congress, in the use of the word "exportation" in section 557, we think, had in mind the ordinary meaning of the word when used in connection with customs matters. Ordinarily, it means the transporting of goods from this country to a foreign country. While the act as a whole shows that Guam is not a part of the United States for certain tariff purposes, we think that in the enactment of section 557, Congress did not intend to regard Guam as a foreign country in connection with exportation. We are brought to this view of the case chiefly because of the legislative history which we regard as pertinent.

This country acquired Guam as a territorial possession under Article II of the treaty with Spain of April 11, 1898, and in the same paragraph of the treaty in which we acquired Porto Rico and other islands then under Spanish sovereignty in the West Indies. The islands of Guam and Porto Rico were ceded to us outright by Article II. We have never exercised a tariff-levying jurisdiction over the island of Guam, but have over Porto Rico. We are not informed as to the reasons nor do we regard it as important why there is a differentiation between them for tariff purposes. In Article III of the same treaty, Spain ceded outright the archipelago known as the Philippine Islands, and in the same article we agreed to pay Spain the sum of $20,000,000. During the history of our connection with the two islands, in many respects they have been treated alike for legislative purposes and in many respects they have been treated on an entirely different basis. As we understand it, the Navy Department of the United States administers the government of the island of Guam, while the Philippines have a government largely of their own making and more independent in character. The Volstead Act for the enforcement of the eighteenth amendment to the Constitution does not apply to the Philippine Islands, while it does apply to

Porto Rico. We are not informed as to the status of Guam in this respect.

On March 8, 1902, Congress passed an act (32 Stat. 55), chapter 108, paragraph 7 of which reads in part as follows:

* * * merchandise in bonded warehouses * * * upon which duties have not been paid may be shipped without the payment of duties to the Philippine Islands * * * under such rules and regulations as may be prescribed by the Secretary of the Treasury.

In section 457, Title 19 of the Code of Laws of the United States, Congress has consolidated the above-quoted portion of the Act of March 8, 1902, and section 557 of the Tariff Act of 1922, and they now read in part as follows:

* * * Such merchandise * * * may be withdrawn for exportation to a foreign country or the Philippine Islands or for transportation and exportation without the payment of duties thereon.

Subsection (a) of section 2 of the enacting clause of the Code of Laws of the United States, reads as follows:

SEC. 2 (a) The matter set forth in the code, evidenced as hereinafter in this section provided, shall establish prima facie the laws of the United States, general and permanent in their nature, in force on the 7th day of December, 1925; but nothing in this act shall be construed as repealing or amending any such law, or as enacting as new law any matter contained in the code. In case of any inconsistency arising through omission or otherwise between the provisions of any section of this code and the corresponding portion of legislation heretofore enacted effect shall be given for all purposes whatsoever to such enactments.

The enactment of the special provision, applying to the exportation of merchandise to the Philippine Islands, of the Act of 1902, *supra*, and the action of Congress in connection with the same matter in the code referred to above, would seem to point out to us that Congress intended to treat the Philippine Islands for the purposes of the application of section 557 in an entirely different manner from the treatment which was accorded to Guam. As such legislation was regarded as necessary in order that goods in bonded warehouse upon which duties had not been paid, but which were exported to the Philippine Islands, should not bear duty here, and since Guam was not included, it seems to follow that shipments to Guam must necessarily have a different status than would shipments to the Philippines. If Congress had intended that goods remaining in bonded warehouse in the United States, and upon which no duties had been paid, could be exported to Guam without the payment of duty, it certainly would have included the island of Guam in the Act of March 8, 1902.

With reference to long-continued administrative practice, the Government's contention in its brief is as follows:

Long-established practice is a master rule, and article 243 of the Customs Regulations of 1923, being founded partly on T. D. 23367, which was a ruling

made by the Treasury Department November 20, 1901, on shipments from bonded warehouses in the United States to Guam, it follows that 27 years' practice by the United States Customs Court is sufficient to justify the doctrine always held by this court that "reasonable regulations of the Secretary of the Treasury made in pursuance of law are entitled to and have the force of law."

Penick & Ford v. United States, 12 Ct. Cust. Appls. 432, T. D. 40611; Gallagher & Ascher v. United States, 14 Ct. Cust. Appls. 38, T. D. 41548.

The authorities last cited by the Government seem to support that part of its contention that reasonable regulations of the Treasury Department made in pursuance of law have the force and effect of law. But we find abundant support for the applicability of the doctrine of long-established administrative practice in a case quite similar in character to the one at bar in Swan & Finch Co. v. United States, 190 U. S. 143.

So it follows that regardless of whether Guam is a foreign country or otherwise, and regardless of the ordinary primary definition of the word "exportation," we think the intent is made clear that Congress, by the use of the word "exportation," under the circumstances did not intend that a shipment to Guam should be an "exportation" within the purview of the section.

The collector at the port of San Francisco was correct in liquidating the rice as dutiable. The judgment of the United States Customs Court should be and is affirmed.