(C. D. 2220)

SCHNITZER STEEL PRODUCTS CO. *v.* UNITED STATES

United States Customs Court, Second Division

(Decided November 23, 1960)

*Lawrence & Tuttle* (*Barnes, Richardson & Colburn* by *George R. Tuttle, Jr., Edward N. Glad,* and *E. Thomas Honey* of counsel) for the plaintiff.
*George Cochran Doub,* Assistant Attorney General (*Richard E. FitzGibbon* and *Murray Sklaroff,* trial attorneys), for the defendant.

Before LAWRENCE, RAO, and FORD, Judges; LAWRENCE, J., not participating

RAO, Judge: The five protests here involved, which have been consolidated for purposes of trial, relate to several shipments from the island of Guam of scrap lead, described in the respective entry papers as follows:

| Protest number | Entry number | Description |
|---|---|---|
| 299004–K | 0407 | 23 Drums Scrap Pure Lead |
| | | 4 Drums Scrap Pure Lead |
| | | 253 Drums / 11 Rolls } Scrap Lead Cable |
| 299005–K | 0663 | 22 Pcs. Scrap Lead Ingots |
| 301487–K | 0861 | 1 Drum Scrap Pure Lead and Zinc |
| | | 5 Drums Scrap Pure Lead |
| 301488–K | 0775 | 10 pcs. pure lead ingots |
| 301814–K | 0383 | 7 Drums scrap pure lead |
| | 0491 | 12 pcs. Lead Ingots remelted from Scrap Lead [*pro forma* invoice] |

The collector of customs at the port of entry classified said merchandise as scrap lead within the provisions of paragraph 392 of the Tariff Act of 1930, as modified by the Torquay Protocol to the General Agreement on Tariffs and Trade, 86 Treas. Dec. 121, T.D. 52739, and, accordingly, assessed duty on the lead content thereof, at the rate of $1\frac{1}{16}$ cents per pound.

Various claims are alleged in the protests for the free entry of the subject material, specifically that it falls within the provisions of section 301 of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1954, for products of Guam; that it constitutes American goods returned without advancement in value, within the purview

of paragraph 1615(a) of the Tariff Act of 1930, as amended by the Customs Administrative Act of 1938; that it is lead scrap, imported to be used in remanufacture by melting, as provided in Public Law 869, 81st Congress, 56 Stat. 171; or that, Guam, being a territory of the United States, this merchandise was never exported and, therefore, did not become an importation upon its return to the United States.

As the case has been presented for decision, however, the only claim relied upon, and to which proof has been addressed, is for free entry within section 301, as amended, *supra*. Since the alternative contentions have not been pressed, they are deemed to be abandoned and are, therefore, dismissed.

The provisions of law remaining in contention read as follows:

Paragraph 392, as modified by T.D. 52739, *supra*:

Lead bullion or base bullion, lead in pigs and bars, lead dross, reclaimed lead, scrap lead, antimonial lead, antimonial scrap lead, type metal, Babbitt metal, solder, all alloys or combinations of lead not specially provided for_____ 1¼₆¢ per lb. on lead content

Section 301 of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1954:

SEC. 301. INSULAR POSSESSIONS.

There shall be levied, collected, and paid upon all articles coming into the United States from any of its insular possessions, except Puerto Rico, the rates of duty which are required to be levied, collected, and paid upon like articles imported from foreign countries; except that all articles the growth or product of any such possession, or manufactured or produced in any such possession from materials the growth, product, or manufacture of any such possession or of the United States, or of both, which do not contain foreign materials to the value of more than 50 per centum of their total value, coming into the United States directly from any such possession, and all articles previously imported into the United States with payment of all applicable duties and taxes imposed upon or by reason of importation which are shipped from the United States, without remission, refund, or drawback of such duties or taxes, directly to the possession from which it is being returned by direct shipment, shall be admitted free of duty upon compliance with such regulations as to proof of origin as may be prescribed by the Secretary of the Treasury. In determining whether an article produced or manufactured in any such insular possession contains foreign materials to the value of more than 50 per centum, no material shall be considered foreign, which, at the time such article is entered, or withdrawn from warehouse, in the United States for consumption, may be imported into the United States from a foreign country, other than Cuba or the Philippine Republic, free of duty.

Pursuant to specific authority delegated to him by the provisions of said section 301, as amended, *supra*, the Secretary of the Treasury promulgated the following amendment to section 7.8 of the Customs Regulations:

7.8 Insular possessions of the United States other than Puerto Rico.—(a) When articles coming directly into the United States from an insular possession, other than Puerto Rico, in a shipment valued over $25 are sought to be admitted free of duty under the provisions of section 301, Tariff Act of 1930, as amended, relating to certain articles produced in such insular possessions, there shall be filed in connection with the entry a certificate of origin covering articles shipped from insular possessions (except Puerto Rico) to the United States, customs Form 3229, signed by the chief or assistant chief customs officer at the port of shipment, showing that such merchandise is the growth or product of such possession, or manufactured or produced in such possession, from materials the growth, product, or manufacture of any such possession or of the United States, or of both, which do not contain foreign materials to the value of more than 50 per centum of their total value. Such certificate shall not be required for any shipment valued at $25 or less.

(b) When articles coming directly into the United States from an insular possession, other than Puerto Rico, in a shipment valued over $25 are sought to be admitted free of duty under the provisions of section 301, Tariff Act of 1930, as amended, relating to certain articles returned to the United States, there shall be filed in connection with the entry the following evidence:

(1) A certificate, customs Form 4467, of the collector of customs at the port from which the merchandise was shipped from the United States, except that no such certificate shall be required if the collector is satisfied by reason of the nature of the articles or otherwise that no drawback of duties or refund or remission of taxes was allowed on the merchandise by reason of such shipment. This certificate shall be issued on application of the importer, or of the collector at the importer's request, and shall be mailed by the issuing officer directly to the port at which it is to be used. If the merchandise was shipped from the port at which entry is made and the fact of shipment appears on the records of the customhouse, the fact of return shall be noted on such record but the filing of the certificate on Form 4467 shall not be required.

(2) A declaration of the shipper in the insular possession in the following form;

\*       \*       \*       \*       \*       \*       \*

Such certificate and declaration shall not be required for shipments valued at $25 or less, or in any case where the collector is satisfied by reason of the nature of the articles or otherwise that they were shipped directly to the insular possession and were returned therefrom by direct shipment, and that no drawback of duties or refund or remission of taxes was allowed when the articles were shipped from the United States.

(c) When merchandise, excluding any shipments valued at $25 or less, arrives unaccompanied by a certificate of origin or a declaration of the shipper, or when any other document necessary to complete entry is lacking, a bond for the production thereof may be taken on customs Form 7551, 7553, or other appropriate form, except that a bond for productions of a bill of lading shall be taken on customs Form 7581.

\*       \*       \*       \*       \*       \*       \*

(f) \* \* \* No drawback may be allowed under section 313, Tariff Act of 1930, as amended, on articles manufactured or produced in the United States and shipped to any insular possession. \* \* \*

It appears that, with the exception of entry 0491 of protest 301814–K, the certificates of origin required by section 7.8(a) of said

regulations have been filed. However, it is not disputed that subdivision (b) of said section 7.8 has not been complied with. Neither the certificate showing that drawback was not allowed, nor the certificate relating to direct shipments from the United States to the insular possession and return has been filed in connection with any of the involved entries; and it has not been shown, or even claimed, that the collector has waived the filing of such documents.

Plaintiff takes the position, citing *Crescent Burlap Bag Company* v. *United States*, 40 Cust. Ct. 302, C.D. 1998, that the authority vested in the collector to waive the filing of either or both of the certificates mentioned in said subdivision (b) causes the regulation to be nonuniform and discriminatory, and, therefore, not mandatory. Hence, it is contended that compliance with its terms is not a condition precedent to recovery and that proof of the material facts may be made at the trial.

As we construe the provisions of section 301, as amended, *supra*, and the regulation promulgated in accordance therewith, this question is not in issue in the case. The section permits free entry of three categories of merchandise coming into the United States from an insular possession, except Puerto Rico. These are (1) "articles the growth or product of any such possession," (2) articles "manufactured or produced in any such possession from materials the growth, product, or manufacture of any such possession or of the United States, or of both, which do not contain foreign materials to the value of more than 50 per centum of their total value," and (3) "all articles previously imported into the United States with payment of all applicable duties and taxes imposed upon or by reason of importation which are shipped from the United States, without remission, refund, or drawback of such duties or taxes, directly to the possession from which it is being returned by direct shipment."

Subdivision (a) of the regulation, by its terms, is addressed to categories (1) and (2), while subdivision (b) covers the third category. Since the two portions of the regulation apply to different situations affecting merchandise coming into the United States from an insular possession, they are separable and independent. The circumstance that either part may be shown to be invalid, as nonuniform or discriminatory in operation, and, hence, not mandatory, would not *ipso facto* establish the invalidity of the other. All of the terms of either subdivision are capable of fulfillment, without relation to its fellow. Indeed, they are mutually exclusive.

Interpretation of a statute or of a regulation having the force and effect of law, consistent with its validity, is desirable. *St. Louis Southwestern Railway Co.* v. *State of Arkansas*, 235 U.S. 350; *Lamborn & Co., Inc.* v. *United States*, 27 C.C.P.A. (Customs) 46, C.A.D. 60. And where unconstitutional, invalid, or illegal segments of a law may be

struck down without emasculating the remaining provisions, or destroying the ultimate purpose designed to be achieved, that portion of the enactment not open to the challenge of invalidity should be preserved. *Goldman* v. *United States*, 28 C.C.P.A. (Customs) 162, C.A.D. 139; *United States* v. *American Bitumuls & Asphalt Co., et al., etc.*, 44 C.C.P.A. (Customs) 199, C.A.D. 661.

Accordingly, whether or not the provisions of subdivision (b) of said section 7.8 are invalid by reason of nonuniformity or discrimination, because the collector may dispense with the filing of the certificates therein required, under the principles enunciated in *Crescent Burlap Bag Company* v. *United States, supra*, subdivision (a) of the section is not subject to the same infirmity. As regards articles produced in insular possessions, customs Form 3229, a certificate of origin, signed by the customs officer at the port of shipment, must be submitted in connection with the entry. Except for the fact that, pursuant to subdivision (c) of the regulation, a bond may be filed for the production of the certificate of origin, the collector is not authorized to waive its filing.

The provisions of said section 7.8(a) of the Customs Regulations, as amended, have not been challenged as arbitrary, unreasonable, or discriminatory. Accordingly, they are mandatory, and compliance therewith is a condition precedent to free entry of articles produced in an insular possession.

Since the official papers in entry 0491, which, together with those in each of the other involved entries, were introduced into evidence, do not reveal a certificate of origin, and counsel for plaintiff concedes that said certificate was not filed, the claim for free entry of the merchandise included in that shipment must be overruled.

No useful purpose is here served by a determination of whether or not subdivision (b) of said regulation is, by virtue of its waiver provisions, nonuniform or discriminatory. The record does not establish, nor is it otherwise claimed, that the lead scrap in issue consisted of *previously imported merchandise* shipped directly to the possession and returned therefrom by direct shipment. There is no evidence from which it may be inferred that the third category of articles specified in said section 301, as amended, *supra*, embraces the lead scrap involved in these actions.

Section 301 of the Tariff Act of 1930, as originally enacted, related solely to shipments between the Philippine Islands and the United States. It provided, in part:

\* \* \* That all articles, the growth or product of or manufactured in the Philippine Islands from materials the growth or product of the Philippine Islands or of the United States, or of both, or which do not contain foreign materials to the value of more than 20 per centum of their total value, upon

which no drawback of customs duties has been allowed therein, coming into the United States from the Philippine Islands shall hereafter be admitted free of duty.

The comparable portion of the present section relating to merchandise shipped to the United States from an insular possession omits the phrase "upon which no drawback of customs duties has been allowed therein," from the description of permissible foreign materials entering into the manufacture or production of articles composed of materials the growth, product, or manufacture of that possession or of the United States. While it is true that the amended section 301 comprises a complete revision of the original enactment, which was repealed in 1946, the purport and tenor of its provisions are designed to accomplish the same general objectives, with respect to merchandise coming from our insular possessions as theretofore obtained with respect to shipments from the Philippine Islands.[1] It is, therefore, significant that the phrase in question was not retained in the revised section.

A change of language in a legislative pronouncement ordinarily presumes a change of meaning, unless the contrary is plainly made to appear. *Fynaut & Popek* v. *United States*, 23 C.C.P.A. (Customs) 265, T.D. 48112; *United States* v. *American Brown Boveri Electric Corporation*, 17 C.C.P.A. (Customs) 329, T.D. 43776. In omitting the drawback limitation upon foreign materials used in the production of articles coming from one of the possessions, Congress has eliminated from considerations of their value the question of the remission of duties or taxes previously paid. With respect to merchandise covered by the second category of articles accorded free entry by the provisions of section 301, as amended, as the provisions now read, the issue of whether or not drawback has been allowed is irrelevant to the determination of whether or not such merchandise is entitled to free entry. Articles manufactured or produced from materials the growth, product, or manufacture of the United States or its possessions, or both, which do not contain foreign materials to the value of more than 50 per centum of their total value, are exempt from the payment of duty.

Evidence of the components of the subject merchandise, its sources, and its processing was supplied in the instant case by Peter Sgro, the general manager and executive vice president of Island Equipment Co., Inc., a Guam corporation dealing in scrap products, upon written interrogatories propounded under two commissions issued by the

---

[1] Prior to the adoption of the amended section in 1954, shipments originating in the various insular possessions of the United States, including Guam, were accorded free entry. *John Rothschild & Co. et al.* v. *United States*, 16 Ct. Cust. Appls. 442, T.D. 43190; *Dulien Steel Products, Inc., of Calif. and W. J. Byrnes n Co., Inc.* v. *United States*, 35 Cust. Ct. 339, Abstract 59548.

court, and by Leonard Schnitzer, vice president of the plaintiff, an Oregon corporation engaged in the ferrous and nonferrous scrap business, and part owner of said Island Equipment Co., Inc.

Sgro testified substantially as follows: He has been in charge of operations of the Island Equipment Co., Inc., for a period of over 5 years. The company is engaged in the scrap business on the island of Guam, and, among its many activities, it operates a smelter for the processing of lead.

The company purchases its ferrous and nonferrous metals mainly from the Armed Services of the United States stationed on the island of Guam. Small quantities are also purchased from the Government of Guam, and from private individuals who had gathered scrap from various parts of the island. Lead scrap was acquired in several forms—as sheets, lead-covered cables, ingots, and from miscellaneous items containing lead. Some of the articles purchased were marked with the names of American manufacturers, and, to the best of his knowledge, predicated upon his observation and experience, almost all the material purchased and/or processed by his company was of American origin.

With particular reference to the material involved in the instant shipments, Sgro stated that the scrap lead cable was acquired in the form of whole communication cables, all reeled on the original wooden reels as it was shipped from the United States. This material was run through a cable stripper which stripped the lead sheathing from the cable. The scrap lead sheathing was placed in old steel oil drums for shipment to the United States and was so packed for convenience in handling and economy in shipping.

The four lots of scrap pure lead were derived from various manufactured articles which were melted down in a smelter. After foreign objects, attachments, and impurities were removed, the material was poured into half or third sections of oil drums, for convenience of handling and shipping. This material was all of United States origin, to the best of his knowledge, based on firsthand contact, and did not contain any components that originated in any country other than the United States or Guam.

With reference to the scrap lead and pure lead ingots forming part of the instant shipments, the witness testified that the lead material was first acquired in the form of lead-covered telephone communication and power supply cables, and also as lead attachments to pieces of steel, nonferrous metals, airplane parts, etc. Some of the cables had numerous steel woven wire sheathings, and all of the cables contained various quantities of paper, tar, hemp, copper wire, and other foreign matter. Practically all of the cables were on their original reels showing the original manufacturer as of American

origin. After reduction in size for convenience in handling, the pieces were hand-fed into the smelting furnace, which, by reason of special design and processing techniques, permits the refined lead to be withdrawn from taps at the back of the furnace and the undesired material and impurities to be slagged out. The lead ingots were melted into large chunks known as "coat buttons," weighing from 1,000 to 1,500 pounds. While the button was still in the molten state, a loop of steel or cable was inserted in the top for conveniences in handling with forklifts.

The witness Schnitzer, who had made many trips to the island of Guam since the formation of Island Equipment Co., Inc., in 1950, confirmed the evidence given by his general manager. He stated that it was he who had effected the acquisition by the company of the scrap metals which it processed, some by personal purchase, and some by direction to buy merchandise he had previously seen; and that the material which he saw was all lead communication cable in various sizes, almost all of which was on the original wooden reels marked with the name of Phelps Dodge.

A letter from the Bureau of Customs, introduced into evidence as plain'iff's exhibit 6, recited that a drawback rate in favor of Phelps Dodge Copper Products Corp. for the allowance of drawback on lead or lead alloy covered copper wire and cable manufactured at its Yonkers, N.Y., factory, with the use of lead, was authorized on November 1, 1940, T.D. 50274–H.

Counsel for the defendant introduced no evidence other than the official papers covering each of the involved entries. He argues, however, that the evidence submitted by the plaintiff is insufficient to establish the origin of the material used in the production of the subject merchandise. It is urged that the statements of the witnesses as to the American origin of the scrap material are mere conclusions unsupported by factual evidence.

While it is true that much of the testimony of plaintiff's witnesses consisted of conclusions, it is also true that they were able to observe, and did observe, that most of the material which they purchased was marked with the names of American manufacturers. Moreover, these were men with some considerable experience in the metal scrap trade, and it appears that the witness Schnitzer, in particular, testified that he could distinguish between American and Guam merchandise and material coming into that island from other sources. This testimony was not controverted in any respect. It tended rather to be corroborated by the certificates of origin moved into evidence by the defendant. These contain verifications by the deputy chief customs officer of Guam of the fact that the merchandise was either a product of Guam or from materials the growth, product, or manufacture of

the United States, which did not contain foreign materials. It must be presumed that this customs official properly performed his duties and that his certification was predicated upon knowledge of the facts approved. We are of opinion, therefore, that the evidence of record in this case was sufficient to establish, *prima facie*, that the scrap lead converted into the merchandise at bar was predominantly of American origin.

There can be no question that the scrap lead products which were melted down for the removal of foreign matter and impurities and were converted into drum molds or lead ingots were manufactured or produced in Guam within the second category of exempted articles. The record shows that efforts were made to segregate lead which is pure from lead which is contaminated. While much of the processing in Guam was undertaken to reduce the recovered lead to forms convenient for handling, with economy in shipping costs, it also appears from the testimony that it is not possible for a lead consumer to use anything except good class clean lead from which all impurities and foreign objects have been removed.

No construction of the phrase, "manufactured or produced," as it appears in section 301, as originally enacted or as amended, has been uncovered by the court's research into the question which might have a bearing upon the matters here in issue. However, a similar phrase in the drawback statute, section 313 (a) of the Tariff Act of 1930, was held by our appellate court to apply to a treatment of a paint substance which resulted in the removal of certain impurities which would otherwise have rendered the paint unfit for its intended purpose. *United States* v. *International Paint Co., Inc.*, 35 C.C.P.A. (Customs) 87, C.A.D. 376.

It has also been held, within the context of the drawback statute, that while the term "production" may well be more inclusive than the closely related expression "manufactured," "[m]ere change of shape or form * * * is not production." *United States* v. *Dunkel & Co., Inc.*, 33 C.C.P.A. (Customs) 60, C.A.D. 317. Accordingly, the conversion of large cakes of butter into 1-pound print packages was not a manufacture or production within the contemplation of the drawback statute.

The *Dunkel* case has application to the lead scrap sheathing which the instant record shows to have been stripped from cables much as the skin is peeled from a banana. All that was accomplished by that operation, as herein revealed, was the separation of the lead sheathing from the core of the cable. The sheathing was not then further processed. It was simply packed into old steel drums for shipment to the United States. Since there was no change in the character or composition of the lead sheathing, it was neither manufactured nor

produced within the meaning of those words, as construed in the *Dunkel* case and the authorities therein cited.

We see no occasion for ascribing to the phrase under consideration a broader connotation than it possesses within the context of the drawback provision. The latter has been liberally interpreted so as to promote and encourage American industry and provide work for American labor. It would seem that no more compelling justification underlies the congressional purpose to permit the free entry of certain articles originating in our insular possessions.

In view of the foregoing considerations, the claim for free entry of the 253 drums and 11 rolls of scrap lead cable covered by protest 299004–K is overruled, as is the like claim for the 12 pieces of lead ingots to which entry 0491 of protest 301814–K relates for failure to file a certificate of origin. As to all other merchandise herein involved, we hold it to be free of duty within the provisions of section 301 of the Tariff Act of 1930, as amended, as articles manufactured or produced in an insular possession from materials the growth, product, or manufacture of such possession or of the United States, not containing foreign materials to the extent of more than 50 per centum of their total value.

Judgment will be entered accordingly.