(C. D. 2597)

Mitsubishi International Corp.
J. T. Steeb & Co., Inc. } *v.* United States

United States Customs Court, First Division

(Decided December 8, 1965)

*Glad & Tuttle* (*George R. Tuttle* of counsel) for the plaintiffs.
*John W. Douglas*, Assistant Attorney General (*Bernard J. Babb*, trial attorney), for the defendant.

Before OLIVER, WILSON, and NICHOLS, Judges

NICHOLS, Judge: The merchandise involved in these cases, consolidated at the trial, consists of corrugated roofing sheet, produced by Woodbury Co. of Portland, Oreg., from 22 coils of steel sheet which had been imported from Japan and entered at Portland on December 21, 1962. The converted material was subsequently shipped to Guam through the port of San Francisco. Five of the coils (covered by entry No. 66, protest No. 63/17678) had been entered under a temporary importation bond and liquidated damages in the amount of one and one-quarter times the amount of duty ($243.90) were assessed because of failure to export to a foreign country. The shipment, of which the remaining 17 coils were a part (entry No. 4457, protest No. 63/17677), was entered for consumption and drawback was applied for as to the merchandise produced from the 17 coils. The application was denied and no drawback was ever paid.

Protests were filed claiming (1) that the denial of the application for drawback was illegal and void and, therefore, the assessment of customs duty and/or penalty was illegal and void, and (2) that exportation of the metal to Guam constituted exportation within the meaning of section 308, Tariff Act of 1930, as amended (*infra*), and, therefore, the assessment of liquidated damages was illegal and void.

Details as to the transactions were established through the testimony of Joseph T. Pickett, purchasing agent of Woodbury Co., and Adolph Carr, customhouse broker for J. T. Steeb & Co., Inc., and a number of documents.

It appears from the record thus presented that the 22 coils involved herein were processed in this country into 2½-inch standard corrugated roofing sheet, which was cut to the lengths required, stacked,

bundled, wrapped, and shipped to Island Equipment Co. in Guam through the port of San Francisco. The sheets were made for use on Guam and had a continuous wave about one-half inch deep and 2½ inches wide, which increased their strength for use as roofing. The amount of waste resulting from the conversion process was less than one-tenth of 1 percent.

The total number of pounds covered by entry No. 4457 (protest No. 63/17677) was 678,979 pounds, of which 83,980 pounds in 9 bundles were shipped to Guam. An application for drawback was made as to this merchandise. After being advised by the collector that a shipment to Guam was not an exportation, the importer withdrew the application, but it was later reinstated. The application was denied on the ground that a footnote to the Customs Regulations (*infra*) provides that no drawback is payable on merchandise shipped to Guam. Nevertheless, a notice of exportation of articles with benefit of drawback, covering the nine bundles to be shipped from San Francisco to Guam was prepared and submitted to customs officials. The portion certifying that the articles were exported was signed by Mr. Greenwell on behalf of the collector at San Francisco. No drawback has in fact been paid or granted by the Government.

As stated, the five coils covered by entry No. 66 (protest No. 63/17678) had been entered under a temporary entry bond. An application was thereafter made to export the merchandise produced with these coils under special bond and the deputy collector at San Francisco directed that the packing, transfer, and lading be supervised by customs officials. (Application attached to entry No. 66.) It was stipulated that this merchandise was actually shipped to Guam. However, liquidated damages or a penalty in the amount of $243.90 were assessed for failure to export the merchandise. A petition for mitigation was filed with the collector but it was denied. The amount of liquidated damages assessed has been paid.

Although two sets of facts are presented, the sole issue is whether merchandise which has been produced in this country with the use of imported material and shipped to Guam has been "exported" within the meaning of sections 308 and 313(a) of the Tariff Act of 1930, as amended. These sections, and other pertinent provisions of the tariff act, as amended, read as follows:

Section 308, as amended by the Customs Simplification Act of 1953, 67 Stat. 507, and by 72 Stat. 118:

The following articles, when not imported for sale or for sale on approval, may be admitted into the United States under such rules and regulations as the Secretary of the Treasury may prescribe without the payment of duty, under bond for their exportation within one year from the date of importation, which period, in the discretion of the Secretary of the Treasury, may be extended,

upon application, for one or more further periods which, when added to the initial one year, shall not exceed a total of three years:

> (1) Merchandise imported to be repaired, altered, or processed (including processes which result in articles manufactured or produced in the United States); * * *

> \* \* \* \* \* \* \*

>> (B) if any processing of such merchandise results in an article (other than an article described in clause (A) of this subdivision) manufactured or produced in the United States—

>>> (i) a complete accounting will be made to the Customs Service for all articles, wastes, and irrecoverable losses resulting from such processing, and

>>> (ii) all articles and valuable wastes resulting from such processing will be exported or destroyed under customs supervision within the bonded period;

## Section 313, as amended by the Customs Simplification Act of 1953, 67 Stat. 507:

(a) ARTICLES MADE FROM IMPORTED MERCHANDISE.—Upon the exportation of articles manufactured or produced in the United States with the use of imported merchandise, the full amount of the duties paid upon the merchandise so used shall be refunded as drawback, less 1 per centum of such duties, except * * *.

\* \* \* \* \* \* \*

(h) TIME LIMITATION ON EXPORTATION.—No drawback shall be allowed under the provisions of this section unless the completed article is exported within five years after importation of the imported merchandise.

## Section 1, as amended by the Customs Administrative Act of 1938, 52 Stat. 1077, by 60 Stat. 1352, and by 69 Stat. 242:

* * * except as otherwise specially provided for in this Act, there shall be levied, collected, and paid upon all articles when imported from any foreign country into the United States or into any of its possessions (except the Virgin Islands, American Samoa, Wake Island, Midway Islands, Kingman Reef, Johnston Island, and the Island of Guam) the rates of duty which are prescribed by the schedules and paragraphs of the dutiable list of this title, namely:

## Section 301, as added by the Customs Simplification Act of 1954, 68 Stat. 1136:

There shall be levied, collected, and paid upon all articles coming into the United States from any of its insular possessions, except Puerto Rico, the rates of duty which are required to be levied, collected, and paid upon like articles imported from foreign countries; except that all articles the growth or product of any such possession, or manufactured or produced in any such possession from materials the growth, product, or manufacture of any such possession or of the United States, or of both, which do not contain foreign materials to the value of more than 50 per centum of their total value, coming into the United States directly from any such possession, and all articles previously imported into the United States with payment of all applicable duties and taxes imposed upon or by reason of importation which are shipped from the United States, without

remission, refund, or drawback of such duties or taxes, directly to the possession from which it is being returned by direct shipment, shall be admitted free of duty upon compliance with such regulations as to proof of origin as may be prescribed by the Secretary of the Treasury. * * *

Section 557, as amended by the Customs Administrative Act of 1938, 52 Stat. 1077, and by 69 Stat. 242:

(a) Any merchandise subject to duty, * * * may be entered for warehousing and be deposited in a bonded warehouse at the expense and risk of the owner, importer, or consignee. Such merchandise may be withdrawn, at any time within three years from the date of importation, for consumption upon payment of the duties and charges accruing thereon at the rate of duty imposed by law upon such merchandise at the date of withdrawal; or may be withdrawn for exportation or for transportation and exportation to a foreign country, or for shipment or for transportation and shipment to the Virgin Islands, American Samoa, Wake Island, Midway Islands, Kingman Reef, Johnston Island, or the island of Guam, without the payment of duties thereon, * * *. Merchandise upon which the duties have been paid and which shall have remained continuously in bonded warehouse or otherwise in the custody and under the control of customs officers, may be entered or withdrawn at any time within three years after the date of importation for exportation or for transportation and exportation to a foreign country, or for shipment or for transportation and shipment to the Virgin Islands, American Samoa, Wake Island, Midway Islands, Kingman Reef, Johnston Island, or the island of Guam, under such regulations as the Secretary of the Treasury shall prescribe, and upon such entry or withdrawal, and exportation or shipment, the duties thereon shall be refunded.

Footnote 3 to section 22.2 of the Customs Regulations provides:

There is no authority of law for the allowance of drawback of customs duty on articles manufactured or produced in the United States and shipped to Alaska, Puerto Rico, Hawaii, the Virgin Islands, American Samoa, Wake Island, Midway Islands, Kingman Reef, the Island of Guam, Canton Island, Enderbury Island, Johnston Island, or Palmyra Island.

Plaintiffs necessarily bear the burden of showing that footnote 3 to section 22.2 of the current Customs Regulations is erroneous and unauthorized by law. At the outset, plaintiffs encounter the fact that, so far as Guam is concerned, this note reflects administrative practice which has been continuous since T.D. 23223 of 1901 (4 Treas. Dec. 686). That ruling stated that Guam and Tutuila were foreign territory insofar as customs duties were concerned, but were "not foreign countries within the meaning of the drawback laws." It referred as authority to the practice of Secretary Gallatin respecting the then newly acquired Louisiana Territory. See also T.D. 33898, 25 Treas. Dec. 491 (1913), and article 243 of the Customs Regulations of 1923. Such administrative practice, duly published to the world, has subsisted from the time Guam came under our flag, or nearly so, through numerous congressional revisions of the drawback laws. It must be virtually conclusive, unless the Congress has changed it, as plaintiffs

contend. We could, therefore, confine our inquiry to whether such a change has in fact been made.

The change relied on by plaintiffs took place, they say, in the enactment of section 401 of the Customs Simplification Act of 1954, amending the Tariff Act of 1930, by inserting section 301, *supra*. The previous law, part of the Organic Act of Guam of 1950, provided for free entry of articles the growth, produce, or manufacture of Guam. 48 U.S.C., section 1421(e). For the rule before 1950, *cf. Dulien Steel Products, Inc., et al.* v. *United States*, 35 Cust. Ct. 339, Abstract 59548.) The new law limited such free entry in various ways, most importantly that the foreign material component of such articles could not exceed 50 percent of the value. Plaintiffs say this made Guam into foreign territory for tariff purposes. But the administrative practice as respecting drawback, by its own terms, was established in disregard of the "foreign" status of the possession as respects duties on its products. Moreover, section 301 in no sense was intended to push Guam and other islands out of the American economic family. Just the contrary. It was a paternalistic law intended to encourage manufacture on the islands for the United States market. Under the former law, the foreign material component could reflect nearly all the value. Under the new, a substantial value had to be added in manufacture on the islands themselves.

If Guam did not acquire the status of a foreign country by section 301, then the meaning of the word "exportation" in sections 313 and 308, *supra*, remains as it was, so far as concerns Guam.

It is clear that Guam is not in fact a foreign country but is an unincorporated territory of the United States. 48 U.S.C., sections 1421, 1421a; *John Rothschild & Co. et al.* v. *United States*, 16 Ct. Cust. Appls. 442, T.D. 43190. It is also clear that, for customs purposes, it is not always treated as a part of the "United States," as defined in tariff acts. Section 401(k) of the Tariff Act of 1930, as amended by the Customs Administrative Act of 1938, 52 Stat. 1077, and by 69 Stat. 242, applicable to subtitle IV and part I of subtitle III, defines the term "United States" as including all territories and possessions of the United States, except the Virgin Islands, American Samoa, Wake Island, Midway Islands, Kingman Reef, Johnston Island, and the Island of Guam. Section 1 of said tariff act, *supra*, which levies duties on articles imported from foreign countries into the United States, expressly excepts articles imported into Guam and other named possessions. Section 557, *supra*, permits merchandise to be entered for warehouse and withdrawn for shipment to Guam and other named possessions, without payment of duties, or if duties have been paid, with a refund thereof. No corresponding express

provisions covering shipments to our insular possessions appear in sections 313 or 308, *supra*. The cited sections and their legislative history evince no intent on the part of Congress to extend the benefits of sections 313 and 308 to shipments to Guam.

Under the Tariff Act of 1922, it was provided, in section 557:

\* \* \* Any merchandise subject to duty, \* \* \* may be entered for warehousing and be deposited in a bonded warehouse at the expense and risk of the owner, importer, or consignee. Such merchandise \* \* \* may be withdrawn for exportation or for transportation and exportation without the payment of duties thereon \* \* \*.

It has been held that the term "exportation" in that section did not include shipments to Guam. *John Rothschild & Co. et al.* v. *United States, supra.* The court stated (p. 446):

Congress, in the use of the word "exportation" in section 557, we think, had in mind the ordinary meaning of the word when used in connection with customs matters. Ordinarily, it means the transporting of goods from this country to a foreign country. While the act as a whole shows that Guam is not a part of the United States for certain tariff purposes, we think that in the enactment of section 557, Congress did not intend to regard Guam as a foreign country in connection with exportation. We are brought to this view of the case chiefly because of the legislative history which we regard as pertinent.

The court then noted the different treatment accorded to Guam, Puerto Rico, and the Philippine Islands, and pointed out that express statutory provision had been made for withdrawal from warehouse and shipment of merchandise to the Philippine Islands, without payment of duty. It concluded (pp. 447–448):

\* \* \* As such legislation was regarded as necessary in order that goods in bonded warehouse upon which duties had not been paid, but which were exported to the Philippine Islands, should not bear duty here, and since Guam was not included, it seems to follow that shipments to Guam must necessarily have a different status than would shipments to the Philippines. If Congress had intended that goods remaining in bonded warehouse in the United States, and upon which no duties had been paid, could be exported to Guam without the payment of duty, it certainly would have included the island of Guam in the Act of March 8, 1902.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

So it follows that regardless of whether Guam is a foreign country or otherwise, and regardless of the ordinary primary definition of the word "exportation," we think the intent is made clear that Congress, by the use of the word "exportation," under the circumstances did not intend that a shipment to Guam should be an "exportation" within the purview of the section.

This decision was handed down on January 9, 1929. At hearings before the Ways and Means Committee of the House of Representatives beginning on February 25, 1929, in connection with legislation which became the Tariff Act of 1930, it was brought out that the

Virgin Islands, Guam, and Tutuila had their own separate customs duties, and that when merchandise was withdrawn from warehouse and shipped to those islands, it had to pay double duties—here and at its destination. It was, therefore, urged that the Virgin Islands, Guam, and Tutuila be given the benefits of section 557. (Hearings before the Committee on Ways and Means, House of Representatives, Seventieth Congress, second session, vol. 16, pp. 9755, 9804–9805.) The committee thereafter recommended that section 557 provide that merchandise may be withdrawn for shipment to these possessions, without the payment of duties. (Report No. 7 to accompany H.R. 2667, pp. 182, 236.)

It seems evident that section 557, as subsequently enacted did not reject the *ratio decidendi* of the *Rothschild* case but accepted it and built upon it. It stated precisely that it included in its benefits merchandise withdrawn for exportation to a foreign country *or* shipment to the named insular possessions. It did not state that shipment to the latter constituted an *exportation* to a *foreign country*. Therefore, we conclude that, in 1930, at least, when the Congress used the word "exportation" only, in sections 308 and 313, it did not intend to include shipments to insular possessions. Note also sections 309 (b), 313 (g), and 317, which use express language where Congress intended to extend benefits to merchandise which might not be considered "exported" in the strict sense of the word.

Section 301 refers to drawback in the provision covering articles previously imported into the United States with full payment of duties which are shipped directly to the possession, without remission, refund, or *drawback*. It was, therefore, contemplated that there might be merchandise shipped to insular possessions from the United States on which drawback might have been allowed. Drawback is in fact granted in certain circumstances—not those here involved—by section 557, *supra*. It appears that the purpose of the language in section 301 is to insure that if previously imported merchandise is shipped to an insular possession and returned without remanufacture, the United States shall receive or retain customs duty thereon. Thus, if any remission, refund, or drawback has been allowed on a shipment to the insular possession, duty shall be assessed on the return of the merchandise. There is no indication of an intent to broaden the allowance of drawback to shipments to an insular possession of merchandise manufactured in the United States from imported materials.

Plaintiffs argue that placing a duty on some importations from Guam implies corresponding benefits for exportations under sections 308 and 313; otherwise, it would permit the Government to charge duties on imports from insular possessions without granting the right

to secure refunds when merchandise is exported to such possessions. Whatever merit this argument may have, we think it is more properly addressed to the Congress than to the courts. Congress may levy duties on merchandise coming from insular possessions, and there is no requirement that it grant corresponding privileges. *Downes* v. *Bidwell*, 182 U.S. 244. The Congress had plenary power to determine the terms on which the right to import may be exercised. *Dart Export Corp. et al.* v. *United States*, 43 CCPA 64, 76, C.A.D. 610. These terms do not include the privilege of shipping manufactured articles to our insular possessions with benefit of drawback, and the courts may not add such privilege by judicial legislation. Just as there is no vested right to import goods, there is no vested right to export them with benefit of drawback, and Congress may subject drawback to any conditions it sees fit to impose. *Romar Trading Co., Inc.* v. *United States*, 27 Cust. Ct. 34, 37, C.D. 1344. The provisions for drawback confer a privilege and where there is any doubt as to whether a privilege has been granted, the doubt must be resolved in favor of the Government. *Swan and Finch Company* v. *United States*, 190 U.S. 143, 146; *Carl Matusek Shipping Co., Inc., et al.* v. *United States*, 51 Cust. Ct. 8, 12, C.D. 2406.

Here, there is no express grant of the privilege of drawback to shipments to Guam and other insular possessions, except under the circumstances covered by section 557, *supra*. There are considerations which may have induced Congress not to extend the privilege further. Not all merchandise coming from our insular possessions is subject to duty under section 301; most, presumably, qualifies for the exemption. Therefore, no inference may be drawn that, in assessing duties on some imports to foster manufacture on the islands, the Congress intended to grant privileges on exports.

The drawback on export of manufactures is intended to encourage manufacturing in this country, and the export of manufactured articles. See *Swan and Finch Company* v. *United States*, *supra*, page 146. The effect of the drawback is that the articles can be sold cheaper on export than they otherwise could. It would have been strange if, in a measure to foster manufacture on the islands, the Congress would have also intended to intensify the competition offered insular producers by manufacturers from the continental United States. In this view, the omission to allow drawback on shipments to the islands, in the enactment of section 301, is in no sense anomalous or inadvertent; it fits the congressional purpose.

Furthermore, an "export," in the strict definition, obtains national advantages with respect to the the balance of payments, but this can-

not be said of shipments to insular possessions which are themselves in the dollar area.[1]

For the reasons stated, the collector's refusal to allow drawback on one shipment and the assessment of liquidated damages on the other must be sustained. The protests are overruled, and judgment will be rendered in favor of the defendant.

(C.D. 2598)

---

[1] Plaintiffs filed a "reply brief" on July 22d, without permission and after the date when any brief was due from plaintiffs under our rule 33. This document arrived after the court's opinion was substantially complete. However, it has been considered, in view of the interest and importance of the legal questions involved, wthout committing the court to reviewing such irregular written arguments in other cases.

The "reply brief" builds upon *Procter & Gamble Manufacturing Co.* v. *United States,* 19 CCPA 415, T.D. 45578. That case holds that section 1 of the tariff act, imposing duties on articles "imported from any foreign country" applies to whale oil produced on the high seas by a foreign-flag "floating ship factory" and carried by that "ship factory" to a United States port. It arrives at that conclusion in light of other tariff act provisions reflecting that fishery products collected or manufactured on the high seas were intended to be free of duty only if products of the United States fisheries, i.e., American-flag fishing vessels. The decision reflects a view that a provision by itself unambiguous may be given a meaning other than its natural meaning if the whole statutory scheme indicates the natural meaning is not what was intended. The appellate court expressly passed over whether the foreign factory vessel might have been considered part of a "foreign country" and this possibility is not part of the *ratio decidendi*. The controlling opinion cites other decisions, such as *Holy Trinity Church* v. *United States,* 143 U.S. 457, which are very useful to judges confronted with unambiguous statutes prescribing or seeming to prescribe results they consider anomalous, arbitrary, absurd, and manifestly not intended by the legislature. The case actually before our appellate court, where one part of the statute confuted another, is far from reaching the extremist scope of the *Holy Trinty* doctrine.

We have held that in the case before us now the result which the long-continued administrative practice, the statutory language, and the controlling decisions lead us to, is not absurd, anomalous, arbitrary, or contrary to the legislative scheme viewed as a whole. Therefore, giving *Proctor & Gamble, supra,* all the respect it is entitled to as a decision of our appellate court, it does not throw any cloud on the conclusion we reach herein. The same is true of other authorities and arguments in the "reply brief" which need not be set forth in detail.